The first case today is 14-1-993 United States v. Euripides Georgiadis. Thank you. Judge Barrett, and may it please the Court. My name is Andrew Lefthook. Could you speak and just pull that up a little higher so we can hear you better? Thank you. I'll be arguing on behalf of Mr. Georgiadis. The first claim I'd like to address this morning involves the admission of what we view as highly misleading testimony concerning electronic evidence that was seized in the case. This is found at point two of our brief. In particular, an FBI agent was allowed to testify and compare paper printouts of emails to an electronic device and information on the electronic device, which was not in evidence, not authenticated, and from which the agent did not create any printouts. So essentially what we have is an FBI agent on the stand who's trained to do forensic analysis, but in fact in this particular case took a series of paper copies of electronically stored information received from Google and compared that back at his office to items that came up on a screen. We asked for production of the screenshots and we were not allowed to have them. And so essentially what the agent was able to do was to say that electronically stored information sourced from Google, Google Inc., which produced information in response to a search warrant, he was able to say that that information was the same as information on an unadmitted, unauthenticated electronic drive, which contained, in his words, thousands of emails. Well, I take it that there was nothing in the material that you can test that went beyond what was in the Google materials that were already in evidence. Is that correct? No, that's not correct. Okay, help me out on that then. Well, the testimony essentially did the following, and it's complicated, but there's a drive which the government received from a government witness named Mr. Leitano. That drive was received by the government from Mr. Leitano directly, and no forensic work was ever done on Mr. Leitano's drive itself. And so that information was from the offices of this John Kondo-run entity in Clearwater, Florida. And the significance was that the Google emails, which were admitted, but needed to be, they in themselves were not sufficient to implicate Mr. Giorgiannis directly. Mr. Kondo and others used... What was it about the disputed material that did implicate him directly? In other words, what it said was that these, what the agent was trying to say, was that these Google emails were in fact found on servers in a physical location in Clearwater, Florida, where this entity, BBDA and the other names for it, had offices. So in other words, it's not simply Google had electronic information stored in the cloud, which we say is the account of Mr. Giorgiannis. In fact, the agent is saying, and not only that, this electronic information is the same as, matches exactly the same as electronic information which comes from the Florida offices. Why wasn't, leaving apart the issue of subtle identification here, why wasn't your interest in this sufficiently protected by your capacity to cross-examine the agent? Because we were told, first of all, the agent would not be testifying as an expert. But in fact, Judge Gordon implicitly found that he was so testifying. And once he was testifying as an expert, in the middle of a three-week trial, I was not in a position to effectively rebut his testimony that emails, that electronically stored information sourced from Google, was the same as electronically stored information sourced from Clearwater, Florida. Well, you may have had difficulty in having independent evidence to rebut it, but you could cross-examine him, couldn't you? But that wasn't sufficient, as shown by our new trial motion. I think we did cross-examine him, and I think we were able to. You mean it's not sufficient insofar as we would agree with you that he was testifying as an expert? Is that necessary to your claim that we agree? It's not necessary to my claim. How could you win otherwise? Well, because the expert report submitted with our new trial motion showed that the testimony was not true. In fact, those electronic documents from Google were not the same, not the same as the electronic documents from the Clearwater server. And so whether he was an expert or not, that report, which was introduced with our new trial motion, establishes that the electronic documents were not the same. So misleading testimony was put in whether you call this man an expert or not. But the electronic documents from the Clearwater server were evidenced, as I understand it, by this hard drive delivered by the witness? That's correct. Okay. But that hard drive was never put into evidence by the government. I understand. That's part of your objection. But I take it that the hard drive was available because the witness was using it to do the display and make the comparison, wasn't he? Well, the hard drive, we received a copy of it. That is true. But on that hard drive were thousands of documents, which were testified to. And when you're matching, when you're saying two items of electronically stored information match and are the same, we need to see the particular screenshot that the witness was looking at as he did his comparison. And that we didn't see. The government was not required to produce the screenshot, did not prepare other than a handwritten scratch with check marks or report. And so when this testimony started in the middle of the trial, I asked for a one-week continuance and simply said I need to prepare the kind of report which I ultimately submitted in connection with my new trial motion. Had the continuance been granted, I would have had the time to do that. But we moved to, if the continuance was not going to be granted, we moved to strike the testimony and to let the government rely on the Google emails. But unfortunately that motion was denied. Could you just address the prejudice issue? So let's say we struck the testimony. Given the government, I mean the position is against you that there's a wealth of evidence against your client independent of this particular testimony, linking up the two, including the references to your client in the emails themselves. Well, exactly. But the source of those emails was critical. In other words, we had, there was an email address. But I guess I'm asking, one could make an inference about the source of the email independent of the testimony. One could make that inference, but it is far less strong. Correct. But the question is, it's true that this was additional evidence against your client. I guess what I'm asking is why was this additional evidence making this link, given that there was other basis for finding a link, so significant that it warrants concluding that it was an evidentiary that requires reversal? Because the electronic evidence that was introduced erroneously, and I have to say, I've been doing this a while, and this is the first time I've seen an FBI agent admit on the stand that his testimony was forensically unsound. But more fundamentally, those documents, and I would direct the court in answer to your question, Judge Barron, to the government's closing argument. Because there, those electronic documents were utilized in a very powerful and direct way. And it became absolutely critical that the government used the emails and the attachments. Essentially, the government said the attachments to emails, which included things relating to Century Bank, which supposedly existed somewhere. Did the closing argument refer to the testimony of the agent? No, it did not refer to the testimony of the agent, but it referred to the exhibits that that agent testified to. We've laid that, those pages are laid out in our brief. But those exhibits were in evidence anyway, weren't they? They were in evidence, but they were not tied to our client in a sufficient way. What this testimony did was put the nail in the coffin, if you will, to tie those exhibits not just to some account with his name on it, but to a physical location in Florida where he was. So it's not a question that they weren't tied to your client. They couldn't have been introduced if they weren't tied to your client. You think the agent's testimony tied them more closely to your client than it would have been otherwise. And did so in a way that was forensically, with forensically bad testimony. But the fact remains that the exhibits were in evidence regardless of the agent's testimony and were fair game for the prosecutor in closing argument. Well, but far different fair game than in fact they were because the agent's testimony came in and because an unadmitted hard drive served as the basis for substantial testimony about really the key exhibits in the case. But if he had never testified at all, the emails would have been some evidence against your client. Would have been some evidence, but I think I could have a far more powerful closing argument based on that. Could you address the venue issue? Certainly. The venue issue essentially comes down to is money laundering conspiracy, was the proper venue shown in this case? And specifically I guess for me, could you address the lulling comments issue and why those comments don't suffice to satisfy the venue requirement? Well, there's no case that has been cited or that we have discovered which makes lulling comments a sufficient predicate for venue for section 1956H. But in the abstract there's no reason why it couldn't, right? Well, there is though. I think, Judge Barron, the lulling communications, those cases come from the mail and wire fraud statutes. And the key question always in a mail or wire fraud case is what happens, is a particular mailing or a particular email sufficiently tied to the scheme? And it has been found that lulling communications can be sufficiently tied to a mail or wire fraud scheme. But in this case where no funds at all move through Massachusetts, at least there was no evidence of that, and where the... But just, I guess what I don't understand is if I'm the person engaged in the money laundering and I say, you know, these guys are worried about what's happened to their investment, I think they're going to start raising a fuss about this. When they do, they're going to find out about the money laundering. And if I say, having heard that, oh, don't worry, I'll call them and I'll tell them everything's fine, and that way they'll never find out about the money laundering. Wouldn't that be sufficient to trigger venue? But there's no limiting principle to that. So that would not be enough? It would not be enough because you're talking about... Conspiracy to money launder. But it's not necessarily to facilitate the conspiracy to money laundering. No, no, I say to the person, I'm going to call them and lull the other people so they won't find out about the money laundering. You can do that, but there's no... If the court adopts that rule, there's no limit to how far that can go. That could then justify the finding of venue based on one phone call to a far-flung district with no other connection to the case. Well, if the phone... No, please. Go ahead. Go ahead. No, I was simply going to say, if the phone call is crucial to the success of the conspiracy, I don't see that that is an objection. Well, it's an objection insofar as the phone calls in this case were not crucial to the conspiracy. In other words... They were in furtherance of, but not crucial to, is that the distinction? No, we don't say they were in furtherance of at all. The statute, the money laundering statute has its own venue provision, and in that venue provision it says money laundering conspiracy can be venued in any place where there's an act in furtherance of the conspiracy. Why wasn't a lulling call in furtherance? Well, in this particular case, these calls were simply telephone calls to someone who was hoping to become an investor and who never did. They may have been in furtherance of a mail or wire fraud conspiracy. They were certainly not, in my view, in furtherance of a conspiracy to do... that had essentially two objects. But on reviewing the conviction now, why couldn't a jury have found that, although there was an ambiguity as to whether the call was only for the wire fraud conspiracy, why couldn't a jury say, but, you know, maybe it was also for the whole thing, including the money laundering? Go ahead. The jury could say that, and... It wouldn't be irrational to conclude that. In this particular case, the conspiracy is a conspiracy to violate Section 1957 and engage in transactions worth $10,000 or to conceal. So there's no concealment here going on, and no... It's not in furtherance of a transaction in excess of $10,000 in criminal proceeds. So you have to look at the objects, the charged objects of the 1956 age conspiracy. And the communications in this case, Justice Souter, were not in furtherance of that charged conspiracy. They may well have been furtherance of the underlying wire fraud charges. Thank you. If I could ask for just ten seconds to address the extradition account. We make an argument in .6 of our brief that the money laundering is not covered under the 1902 treaty with the Kingdom of Serbia. I'd simply urge the Court to look very closely at that. Mr. Georgiotis was essentially extradited and tried for a crime that simply is not covered under the treaty. Thank you. May it please the Court. I would like to address most of all the question of Ian Smyth's testimony, because that appears to be what the Court is most focused on and what the defense is devoting most of its brief to. Unfortunately, there's more confusion on this point than there really ought to be. And so I'd like to break down where the e-mails that we're talking about existed. There were three different locations. One were the Google disks. And fortunately for the government, those were where Mr. Georgiotis' e-mail accounts were. The disputed evidence came in two other locations. One was a hard drive that was recovered by this Mr. Laitano at the offices of the Clearwater offices afterwards. There were also hard drives and computers seized by the government at those same offices. And the defense objections was primarily devoted to the computers and hard drives seized by the government due to alleged mishandling by the IRS agents. We disagreed with the defense in the trial court, but we steered away from that evidence because we were trying to get away from sources of electronic evidence that were more controversial. The Laitano hard drive, so when Mr. Georgiotis complains about those hard drives and computers that we seized, he's really talking about evidence that was not offered and not admitted. With respect to the Laitano hard drive, that hard drive had been authenticated through a chain of custody that we had established from Mr. Laitano to the FBI agent who received it into evidence and to Mr. Smythe who had opened e-mails that were on the hard drive. So when you say it had been authenticated, was the Laitano hard drive actually introduced into evidence? It was not, Your Honor. And that was mainly because we don't hand... Well, I don't care why it wasn't. The fact of the matter is that it wasn't, so it's not an exhibit. Correct, correct. And what he was testifying about was what he observed on the Laitano hard drive. The other point that I think is a critical factual point to understand about these e-mails, Mr. Georgiotis was using Google e-mails, Gmail accounts. One was austriacom at gmail.com. The other was egeorgiotis at gmail.com. Both of those were very much tied to him through other witnesses. Again, that aren't part of this appeal. This included several witnesses who knew him, who were friends with him. His girlfriend used the austriacom address, and they corresponded about personal things, including about his birthday party. These are e-mails that could only have been sent by him. We establish through very strong evidence that this was his e-mail account. In fact, the subscriber information had his name on the account. The subscriber information also had the account with the credit cards that were in his name used for any charges that might be associated with the Gmail accounts. There was an address that he lived in in Greece many years ago that was on the subscriber information. There was no doubt at trial that these were his Google e-mail accounts. There were other e-mails used by other co-conspirators that were corporate e-mail accounts from the Clearwater offices. So Mr. Kondo, he was a co-conspirator. Mr. Zinetti was a co-conspirator and a co-defendant. What we were trying to show through Mr. Smythe's testimony was that there were corresponding copies of e-mails that were exchanged between the Google e-mail accounts used by Mr. Georgiades and the corporate e-mail accounts used by his co-conspirators. In so far as those implicated, the Likano hard drive, you're really asking the witness to testify to the jury about something that isn't in evidence. I mean, if this were the old days and we were dealing just with a piece of paper rather than a hard drive and you had a piece of paper not in evidence, even though it had been authenticated, you couldn't have a witness read that to the jury. You have to get it admitted into evidence. And it seems to me that there's a step missing in your progression, unless I've overlooked it. Well, I guess what I would suggest is that in trial practice, we simply cannot hand a piece of electronic hard drive to, because it's meaningless unless you use a computer to open it up. And so what we had were printouts of the e-mail accounts, of e-mails from the Google e-mails. And what Mr. Smythe did was he was able to observe by simply doing what any of us could do, which is open Microsoft Outlook and open an e-mail. Don't assume that any of us can do that. Okay. I'll say many of us, Your Honor, that many of us could open the e-mail account and compare not forensically, but the contents of it, which is, again, something that we do all the time. Is it the same to? Is it the same from? Is it the same date? Is it the same words? Is it the same subject line? And that's what Mr. Smythe was testifying about when he said that things were the same. If there was any doubt on direct examination that that's exactly what he was doing and that he was not doing a forensic analysis, it was made abundantly clear by Mr. Levchuk on cross-examination that there was no forensic analysis done. There was absolutely nothing misleading about his testimony. Your Honor, what these attacks on Mr. Smythe's testimony amount to are an attack on the weight of the evidence. The arguments that are being raised by Mr. Levchuk on this appeal are the same arguments that he and I had before the jury at the trial. And those arguments were appropriate for the jury to decide. As a result, there really is no valid appellate claim here. I would like to address why the testimony was admitted. It was not to tie Mr. Georgiades to the emails. It was to show that Mr. Laitano had not manipulated the hard drive. Now the defense claimed that Mr. Laitano had done something wrong with the hard drive and Mr. Laitano testified that he copied all of the data. And so when the defense states in its brief that the data was randomly selected, he does so in the face of the uncontradicted testimony of Mr. Laitano, which viewing the evidence most favorably to the verdict, I think it's fair to conclude the jury credited that. So what the Smythe testimony did was simply to bolster the credibility of Mr. Laitano that he had engaged in misconduct. What tied Mr. Georgiades to the emails were what I was testifying before. It was not what Mr. Smythe was doing because he was not tying the Google emails to a computer that he was using or anything like that. He was simply saying that the corresponding copies were the same content-wise. And that tended to bolster the fact that Mr. Georgiades and these co-conspirators were corresponding and that Mr. Laitano had not altered the hard drive. Could you address the venue issue? Yes, Your Honor. And I guess in particular, since there isn't any direct reference in the lulling calls to the money laundering scheme, in other words, there's no statement, I'm calling to protect your money laundering scheme. Right. What's your response to the argument that we shouldn't just understand those calls to have been aimed at protecting against the fraud itself rather than an overt act in furtherance of the money laundering scheme? Well, the wire fraud and the money laundering were happening at the same time. But that doesn't make them the same scheme. No, and I understand that. But the point is, for the same reasons that the lulling communications furthered the wire fraud scheme. And this is very well established as part of the First Circuit jury instruction. I guess incidentally, if it's the case that a lulling call could protect you from any illegal activity you were engaged in, no matter how unrelated to the action that the lulling was intended to protect. Right. So is there any evidence here that the lulling calls were intended to protect the money laundering scheme as opposed to the fraud itself? And does it matter if there isn't any evidence? Well, I guess I cannot respond emphatically that there was evidence that the lulling communications were designed to protect the money laundering conspiracy. Because the money laundering communications that were into Massachusetts, the lulling communications into Massachusetts were to a broker for a developer who had already made a deposit. His money, as the evidence showed from the bank records, was being dissipated, it was being spent, it was being concealed as the wire fraud scheme was going on. And so these lulling communications were designed to put the broker and also their clients, who were also CC'd on these e-mails and telephone calls, that everything was fine, that their money was safe. But they were designed to prevent the provider of the funds from discovering the fraud. Unless there was some specific evidence that ties them to the money laundering, I think that's kind of a stretch. I mean the government has the burden of proving the overt act here. Agreed. Does the government have to prove that beyond a reasonable doubt? No, to a preponderance. We have to prove to a preponderance that the overt act was in furtherance of the conspiracy in Massachusetts. So you want us to assume that a lulling call made to a defrauded investor, while fraud schemes and money laundering schemes are going on in parallel, can be assumed or inferred to be in furtherance of the money laundering scheme? I guess what I would say is I wouldn't assume it as a general matter. And this is what the defense argument is suggesting, is that lulling can never further a money laundering scheme. And that's a proposition that I'm not ready to accept. But is there some evidence that something was said during these calls that had any relation to money laundering? Well, I would say that it did, because what it did is it bought... So what was said? It said, first of all, your money is safe and you're going to be funded, or suggested that they were going to be funded, because it wasn't just about putting down deposits. The scheme was to promise that you would get a great deal of funding. And let me just make this point. The buying of time was critical to the money laundering conspiracy. This money laundering conspiracy that we established through witness testimony and bank records took place over more than two years. And you had over 8,000 transactions. I mean, they were absolutely confusing. And they went between 20 different bank accounts. They were sent overseas. Money was spent in a myriad of ways. And the way they went about it took a lot of time. And in fact, the lulling is what gave them the time to do it. Does your argument boil down to this, that when there are two simultaneous schemes going on, and the exposure of one of them would put victims of the other on the alert and say, gee, if he's doing this thing wrong, maybe there's something wrong with the transaction for me, that under those circumstances, a call which is ostensibly to keep people quiet on Scheme A has the effect of keeping them quiet on Scheme B. And that is enough for venue on Scheme B? Your Honor, I'm not sure about that. But I guess the facts of this case are a little different. And that's because the money laundering and the wire fraud are so tied together. The same person is a victim of both, is that what you're saying? Correct. Because it involves the same money. Could you say a little bit more about how the person being lulled was victimized by the money laundering scheme? Well, the money laundering conspiracy was twofold. One was concealing the proceeds, and the other was spending it. So to the extent that the money, his deposit money, was being concealed, it made it more difficult for him to try to recover it. To the extent it was being spent, it was simply unavailable to him because there's no way that once it was spent that he could go after the other. So if I take the argument, it might be a different case if the person who was engaged in the wire fraud here also was subject to a tax evasion. Right, and I think that would be a different scenario. If they made a lulling call, then the argument would be whether there's venue on the tax evasion conspiracy. You'd say no because the person being lulled has no interest in whether they were evading taxes or not. But money laundering, they're actually a victim themselves of the money laundering as much as they are of the wire fraud. Yes, Your Honor. Your Honor, I realize I have 10 seconds left, and I'll cede the remainder of my time unless there are any further questions. Thank you. Thank you.